IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-171 |
| | ) | |
| TIONA L. JONES | ) | |

O P I N I O N

DIAMOND, D.J.

On May 20, 2009, defendant Tiona L. Jones was charged in a three-count indictment with making a false statement in connection with the acquisition of a firearm on or about May 19, 2008 (Count One) and on or about May 20, 2008 (Count Two), both in violation of 18 U.S.C. §922(a)(6); and possession with intent to distribute 100 grams or more of heroin on or about May 27, 2008, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(B)(i) (Count Three). Defendant has filed the following pretrial motions: (1) motion for severance of counts for trial (Document No. 28);[1] (2) motion to produce evidence under Fed.R.Evid. 404(b) and 609 (Document No. 29); (3) motion for discovery (Document No. 30);[2] and (4) motion to suppress evidence and statements (Document No. 31).

---

[1] The court has ruled on defendant's motion for severance of counts for trial. Government counsel indicated at a status conference held on August 30, 2010, that the government did not oppose a severance of Counts One and Two of the Indictment from Count Three. By order dated August 31, 2010 (Document No. 44), the court granted defendant's motion and severed Counts One and Two from Count Three for trial. The order stated that the trial of Count Three will occur first.

[2] At the August 30, 2010, status conference, government counsel provided defense counsel with the police report defendant had requested in her motion for discovery. In addition, government counsel indicated that she did not have in her possession any other documents responsive to defendant's discovery requests. Accordingly, the court entered an order on August 31, 2010 (Document No. 43) denying as moot defendant's discovery motion.

By her suppression motion, defendant challenges the warrantless searches of her automobile, her purse and her residence, which were conducted by the Pittsburgh Police on May 27, 2008. As a result of those searches, the police seized heroin, which is the basis for the charge against defendant in Count Three of the Indictment. Defendant also contends her statements to law enforcement officers should be suppressed because those statements were the fruit of the prior unlawful searches and seizures, and they were taken in violation of her Fifth and Sixth Amendments rights. A hearing on defendant's suppression motion was scheduled for August 30, 2010, but was continued numerous times due to counsels' various scheduling conflicts. The hearing eventually was scheduled to occur on December 13, 2010.

On the morning of the scheduled hearing, government counsel informed defense counsel and the court that she just had been advised by a Pittsburgh Police officer involved in the case that the drug evidence in question, along with defendant's change purse, had been destroyed. The evidence had been stored by the Pittsburgh Police in the Bureau's Property Room. The court directed government counsel to inquire why the evidence had been destroyed. The court then held hearing on December 13, 2010, concerning defendant's motion to suppress statements, but held in abeyance hearing on her motion to suppress the physical evidence.

By letter dated December 20, 2010, government counsel informed the court that the Allegheny County District Attorney's Office confirmed that the heroin and change purse had been destroyed. According to government counsel's letter, an Assistant District Attorney, who believed the state case against defendant had been nolle prossed but was unaware it had been adopted for federal prosecution, had approved destruction of the evidence. Nevertheless, the government indicated it would proceed with the prosecution of defendant's case because the heroin, change

2

purse and other evidence were observed by City of Pittsburgh police officers and the heroin was subjected to laboratory analysis prior to being destroyed.

On January 18, 2011, the court held hearing on defendant's motion to suppress the physical evidence. The government presented the testimony of three Pittsburgh Police officers which will be discussed in more detail below. In essence, however, their testimony indicated that during the course of a traffic stop, one of the officers observed in plain view bricks of heroin in an open change purse which was inside of defendant's larger purse.

Following the January 18, 2011, suppression hearing, defendant filed a motion to dismiss Count Three of the Indictment and, in the alternative, to suppress evidence and statements based upon failure to produce evidence under Rule 16 and destruction of evidence, which was the subject of a hearing held on April 6, 2011. On April 19, 2011, the court filed an opinion in which it concluded that negligence by the Allegheny County District Attorney's Office may have led to destruction of the change purse and the heroin in this case, but that evidence was not destroyed because of any bad faith by the government. Therefore, the court denied defendant's request to dismiss Count Three of the Indictment, as well as her request to suppress evidence and statements based on destruction of evidence.

The court indicated in its April 19, 2011, opinion that it would rule separately on defendant's original suppression motion. For the reasons explained herein, defendant's motion to suppress physical evidence will be denied, and her motion to suppress statements will be granted in part and denied in part.

3

## I.    **Factual Background**

At the suppression hearing held on December 13, 2010, the government presented the testimony of Special Agent Brian Cicco of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and defendant testified on her own behalf at that hearing. See Document No. 56, Transcript of December 13, 2010, suppression hearing (hereinafter, the "First Tr."). At the suppression hearing held on January 18, 2011, the government offered testimony by Sergeant Jason Snyder and Detectives Michael Molitaris and Mark Goob of the Pittsburgh Police. See Document No. 60, Transcript of January 18, 2011, suppression hearing (hereinafter, the "Second Tr."). Defendant again testified, and she also presented the testimony of her sister, Patrice Pendelton, and her daughter, TaTyona Council. Id. The evidence entered at these hearings establish the facts that follow.

In May 2008, Sergeant Snyder was the supervisor of a Pittsburgh Police Narcotics and Vice Impact Squad that was comprised of Detectives Goob and Molitaris, as well as Detectives Fallert, Higgins and Stroschein. Second Tr. at 4, 125. On or about May 27, 2008, Sergeant Snyder received an anonymous complaint concerning narcotics activity at 1511 Rutherford Avenue in Pittsburgh. Second Tr. at 125-26. According to the information Sergeant Snyder received, the occupants of that residence were a black female in her late 20s known as Mutterbutt and a black male also in his late 20s with the nickname "B". Second Tr. at 127.

After receiving that information, on May 27, 2008, Sergeant Snyder assigned Detective Molitaris to conduct surveillance of 1511 Rutherford Avenue. Second Tr. at 6, 128. Shortly after 2:00 p.m., Detective Molitaris observed a white Chevrolet Lumina park in front of the residence. Second Tr. at 9. A female later identified as defendant exited the vehicle carrying bags and a purse,

4

entered the residence, emerged a few minutes later carrying only a purse, got into the car and drove off. Second Tr. at 10.

Detective Molitaris followed defendant's vehicle and observed that one of the brake lights was inoperable. Second Tr. at 11. Detective Molitaris radioed his observation to Sergeant Snyder and Detectives Fallert and Goob, who were positioned nearby in another unmarked vehicle. Second Tr. at 11, 129-30. These officers also were working in conjunction with Detectives Higgins and Stroschein, who were in another unmarked vehicle. Second Tr. at 46. The vehicle with Snyder, Fallert and Goob passed Detective Molitaris' vehicle and followed behind defendant's vehicle. Second Tr. at 11, 130.

In addition to the inoperable brake light, the officers observed defendant fail to stop at a posted stop sign at the intersection of Hampshire and Cape May streets in the Beechview section of the city. Second Tr. at 12, 34, 53, 55-56, 130-31. As a result, the officers activated their lights and siren and conducted a traffic stop of defendant's vehicle on West Liberty Avenue. Second Tr. at 12, 54, 130.

At that point, defendant immediately exited her vehicle without being directed to do so and asked what she did. Second Tr. at 12-13, 56, 133. Detective Goob explained that her brake light was inoperable and that she failed to obey a posted stop sign, and requested that defendant produce her license, registration and insurance information. Second Tr. at 59, 100.

Sergeant Snyder and Detective Fallert approached the passenger side of the vehicle and observed there were two adults and a toddler in the vehicle. Second Tr. at 60, 132, 134. Detectives Higgins and Stroschein also arrived at the scene, and then Detective Molitaris departed and returned to observe defendant's residence. Second Tr. at 14, 15.

5

While still outside of the vehicle and standing at the open driver's side door, defendant reached for her purse, which was on the driver's seat. Second Tr. at 61. When defendant reached into her purse to retrieve her driver's license, Detective Goob observed in plain view inside of the purse an open change purse, which contained several bricks of heroin. Second Tr. at 61, 101, 103. Detective Goob testified that the heroin was in plain view because it was "taking up so much space of the small change purse that it actually couldn't shut. It was kind of forced open." Second Tr. at 61. Detective Goob further testified that one would have "had to pull the heroin out if [the change purse was] turned . . . upside down because it was kind of in there fairly snug." Second Tr. at 103. After viewing the heroin in defendant's change purse, Detective Goob placed her under arrest. Second Tr. at 62. Detective Goob recovered eight bricks of heroin from the change purse, as well as a small cigar box that contained marijuana.[3] Second Tr. at 62, 82-83, 103.

While at the scene of the arrest, Sergeant Snyder advised defendant of her rights under Miranda and explained to her that the police had received a complaint about narcotics activity at her residence. Second Tr. at 62, 137-38. Sergeant Snyder explained that based on the quantity of narcotics found in her change purse, which was consistent with sales, the police were going to apply for a search warrant for her residence. Second Tr. at 137.

Sergeant Snyder testified that defendant was cooperative at that point, and Detective Goob

---

[3]Defendant's version of the events surrounding her arrest differ from the officers' account. According to defendant, after the police stopped her vehicle, they ordered her out of the car, searched it, and discovered heroin in a purse in the passenger compartment. Defendant admitted that she had heroin in her change purse, but claimed the change purse was at the bottom of her larger purse and it was closed. Second Tr. at 218. According to defendant and her sister, Patrice Pendelton, who was a passenger in the vehicle, a police officer searched her purse and discovered the heroin while she was occupied at the rear of the car with other officers. Second Tr. at 171-72, 220. For the reasons explained in Section II.D., infra, the court finds that defendant's testimony is not entirely credible. The court also finds that Ms. Pendelton's testimony is not entirely credible. Having observed Ms. Pendelton's demeanor while testifying at the suppression hearing, it appeared to the court that she lacked candor and she was not a reliable reporter of events that occurred three years ago.

6

testified that defendant indicated she understood her rights. Second Tr. at 63, 138. Defendant stated there were more drugs in her house, which she wanted to have removed before her young son arrived home from school. Second Tr. at 138, 157, 164. Sergeant Snyder and Detectives Goob and Fallert then transported defendant back to her residence. Second Tr. at 63, 138. During the car ride, defendant indicated she would show the police where the drugs were located in her house. Second Tr. at 138.

Upon arrival at defendant's residence, Sergeant Snyder used defendant's key to open her front door. Second Tr. at 138-39. Just as Sergeant Snyder opened the door, defendant's daughter, TaTyona Council appeared, and the officers informed her of the situation. Second Tr. at 139. Sergeant Snyder and Detectives Goob and Fallert entered the house, along with defendant, who continued to express her concern about completing the search prior to her young son arriving home from school. Second Tr. at 139.

The group of officers who entered defendant's house with her realized they did not have a consent to search form with them, so they requested other officers to deliver a form to them. Second Tr. at 65, 139. While waiting for this to occur, which took approximately ten minutes, Detective Goob sat with defendant in her dining area. Second Tr. at 65, 143. Sergeant Snyder testified that defendant remained "pretty calm and collected" throughout this time and during the subsequent search of her home. Second Tr. at 162

After the officers obtained the consent to search form, Detective Goob filled out the form, read the consent to search section to defendant and asked if she understood it, to which she responded that she did. Second Tr. at 68, 140-41. Defendant also read the form herself and then signed it. Second Tr. at 68-69, 139. By signing the consent to search form, defendant

7

acknowledged that she had been informed of her constitutional rights, that she could require the police to obtain a search warrant, that she could refuse consent to a search, that anything found as a result of the search could be seized and used against her in a criminal prosecution, that she could revoke her consent to search at any time, and that she could consult with anyone of her choosing before deciding whether to consent to a search. Defendant's signature on the consent to search form indicated that she understood her rights and voluntarily gave her consent to the police to conduct a search of her residence without any threats or promises being made to her.[4]

After obtaining defendant's consent to search, Detective Goob remained downstairs with her daughter, while she accompanied the officers upstairs and showed them where the heroin was located in a dresser drawer in her bedroom. Second Tr. at 67, 75, 139, 145. The police seized 278 bricks of heroin from defendant's residence, along with $5,759 in cash and indicia of residence. Second Tr. at 20, 78, 145. Detective Goob subsequently photographed the heroin, packaged it and submitted it to the crime lab for analysis, and it tested positive for the presence of heroin. Second Tr. at 76, 145.

After the search was completed, defendant was transported to police headquarters for questioning. Defendant was seated in an interview room and an officer read her a pre-interrogation warning, advising her of her right to remain silent and her right to consult with a lawyer. Second Tr. at 84, 147. Defendant responded "yes" to questions on the Pre-Interrogation Warning Form asking whether she understood her rights. Defendant responded "no" to the question on the form

---

[4]Defendant disputes that she voluntarily consented to a search of her residence. According to defendant, the police coerced her into signing the consent to search form by threatening to tear apart her home and threatening to turn over her children to Children and Youth Services. Second Tr. at 229. As explained in Section II.D., infra, the court finds that defendant's testimony is not entirely credible.

✎AO 72
(Rev. 8/82)

asking whether she was willing to waive her rights and answer questions without the presence of a lawyer. At that point, questioning ceased, as defendant was unwilling to make a statement and had requested a lawyer. First Tr. at 43-44; Second Tr. at 84.

Defendant was charged on May 27, 2008, with possession with intent to distribute heroin, possession of heroin, possession of marijuana and traffic violations. She was incarcerated at the Allegheny County Jail ("ACJ") and retained Attorney James Wymard to represent her on those charges. First Tr. at 44-45. Attorney Wymard met with defendant at the ACJ and advised her not to speak with law enforcement without him present. First. Tr. at 45.

Prior to May 30, 2008, Special Agents Brian Cicco and Brian Fattori of the Bureau of Alcohol, Tobacco, Firearms and Explosives were investigating defendant's recent straw purchases of two firearms, which gave rise to the charges against her in Counts One and Two of the Indictment. First Tr. at 4-7. On May 30, 2008, Agents Cicco and Fattori went to the ACJ to interview defendant concerning the firearms purchases. First Tr. at 7, 9. Agent Cicco testified that the agents were aware defendant had been arrested in connection with a heroin-related incident that occurred a few days prior, but they were unaware of the details of that arrest. First Tr. at 7-8. Agent Cicco also testified he was unaware whether defendant had invoked her Miranda rights at the time of that prior arrest. First Tr. at 33-34.

Agent Fattori first advised defendant of her Miranda rights, and then told her they were there to interview her about the firearms purchases, but not to discuss her recent drug-related arrest by the Pittsburgh Police. First Tr. at 10, 14, 35-36. At the outset, Agent Cicco was uncertain whether defendant had an attorney, but assumed that she did. First Tr. at 10, 28. After inquiring with defendant, the agents learned she had retained Attorney Wymard to represent her in

9

connection with her arrest on the heroin charges. First Tr. at 35, 44-45. According to defendant, she advised Agents Cicco and Fattori that she did not wish to speak with them without her lawyer present, but they proceeded to question her about the firearms purchases. First Tr. at 47-48.

During the interview, defendant made statements concerning the firearms purchases, including the fact that she purchased the guns for her boyfriend, Brian Edwards. First Tr. at 14-16. Eventually, the conversation turned to other topics, including how long defendant and Mr. Edwards had been selling heroin. First Tr. at 16-17. Defendant claims that she made incriminating statements after being repeatedly assured by the agents that she did not need her attorney because they were not recording the interview, and also because the agents promised they would assist her in being reunited with her children.

## II.    **Motion to Suppress Evidence and Statements (Document No. 31)**

Defendant argues that heroin and other evidence seized from her vehicle, her purse and her residence on May 27, 2008, should be suppressed because the police did not have probable cause to stop her vehicle, they did not have probable cause or a warrant to search her vehicle or any items within it, and they did not have probable cause or a warrant to search her residence. Defendant also argues that her statements to law enforcement should be suppressed because those statements were the fruit of the prior unlawful searches and seizures, and they were taken in violation of her Fifth and Sixth Amendments rights.

As an initial matter, when a defendant seeks to suppress evidence, she bears the initial burden of "establish[ing] a basis for [her] motion, *i.e.*, the search or seizure was conducted without a warrant. . . ." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant

10

makes this showing, the burden shifts to the government to demonstrate that the search and seizure were reasonable. Id. Here, the searches at issue were conducted without a warrant, so the government bears the burden to show those searches were reasonable.

### A.    The police had probable cause to conduct a vehicle stop

Defendant first argues that the police did not have either probable cause or reasonable suspicion to stop her vehicle and detain her for questioning because they did not observe her commit any traffic violation. Therefore, defendant claims the stop and detention violated her Fourth Amendment rights, and her statements and the evidence seized from her purse, vehicle and residence must be suppressed because they were the fruit of that prior unlawful stop and detention.

A vehicle stop is subject to the constitutional requirement that it not be "unreasonable" under the circumstances. Whren v. United States, 517 U.S. 806, 810 (1996). The decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred. Id.; see also United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997) ("[i]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations"). Here, the officers credibly testified that the vehicle defendant was driving had an inoperable brake light and defendant failed to come to a complete stop at a posted stop sign. Accordingly, the vehicle stop at issue here was based on probable cause and therefore was reasonable under the Fourth Amendment.

### B.    The police had probable cause to search defendant's vehicle and her purse

Defendant next argues that the evidence seized from her purse and the vehicle she was driving must be suppressed because the police did not have a warrant or probable cause to conduct a search. Defendant also argues that her subsequent statements must be suppressed because they

11

were the fruit of the unlawful search and seizure.

### 1. The officers lawfully seized heroin from defendant's purse because it was in plain view

"The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." Illinois v. Andreas, 463 U.S. 765, 771 (1983). Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). Thus, three elements must be met to establish the validity of a warrantless seizure under the plain view doctrine: (1) the officer was lawfully in the position from which the object could be seen; (2) the incriminating character of the object was immediately apparent; and (3) the officer had a lawful right of access to the object. See Horton v. California, 496 U.S. 128, 136-37 (1990).

After defendant's vehicle was stopped, she exited the vehicle and asked what she did wrong. Detective Goob explained why the police stopped her and asked to see her driver's license. When defendant reached into her purse to retrieve her license, Detective Goob observed inside of the purse in plain view an open change, which contained several bricks of heroin.

We conclude that the officer's seizure of the heroin from defendant's purse was justified under the plain view doctrine. First, as a result of the traffic stop, which we have found proper, Detective Goob was lawfully in a position from which the heroin could be seen. See United States v. Whitney, 2009 WL 3542796 at *2 (3d Cir. Nov. 2, 2009) (holding that police officers who stopped the defendant's car for a traffic violation were lawfully in position from which to observe

12

drugs on the floor of his car using flashlight, and thus cocaine seized following traffic stop was admissible at trial on drug charges under plain view doctrine).

Second, the "immediately apparent" requirement of the plain view doctrine is satisfied in this case. In order for an object's incriminating character to be immediately apparent, the police must have probable cause to believe the object is contraband without conducting a further search. Dickerson, 508 U.S. at 375; see also Texas v. Brown, 460 U.S. 730, 741-42 (1983) (recognizing that probable cause for seizure of evidence satisfies immediately apparent requirement). Here, upon viewing defendant's open change purse, Detective Goob immediately identified the items within to be bricks of heroin. Second Tr. at 61. Detective Goob was capable of making this observation because he previously had been involved in several hundred heroin investigations, and he was well familiar with the manner in which heroin is packaged in the Pittsburgh area. Second Tr. at 47, 121.

Finally, the officers had a lawful right of access to the heroin because the traffic stop was lawful and it was obvious to Detective Goob, as an experienced narcotics detective, that the substance he observed was contraband. As such, the plain view doctrine is satisfied in this case, and the officers properly seized the heroin from defendant's purse.

### 2. The automobile exception to the warrant requirement justifies any subsequent search of defendant's vehicle

Any subsequent search of defendant's vehicle and seizure of evidence was justified under the automobile exception to the warrant requirement. The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if "probable cause exists to believe it contains contraband." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). While a seizure or search of property without a warrant ordinarily requires a showing

13

of both probable cause and exigent circumstances, the "ready mobility" of automobiles permits

their search based only on probable cause. See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999);

Labron, 518 U.S. at 940. To determine whether probable cause to conduct a warrantless search

exists, the court must consider the totality of the circumstances and then decide whether, given all

the facts, there was "a fair probability that contraband or evidence of a crime" would be found in

the place to be searched. Illinois v. Gates, 462 U.S. 213, 238 (1983).

Here, the police would have had probable cause to believe defendant's vehicle contained

contraband. The police had been conducting surveillance of defendant's residence after receiving

a complaint that drug transactions were occurring there and, after defendant was stopped for a

traffic violation, the police observed heroin in plain view in her purse. Under those circumstances,

it would have been reasonable for the police to conclude that contraband would be found in

defendant's vehicle.

This result is consistent with the Supreme Court's recent decision in Arizona v. Gant, 129

S.Ct. 1710 (2009). In Gant, the Supreme Court held that the police may conduct a vehicle search

incident to a recent occupant's arrest "when [he] is within reaching distance of the vehicle or it is

reasonable to believe the vehicle contains evidence of the offense of arrest."[5] Gant, 127 S.Ct. at

1721. The Supreme Court concluded that the vehicle search at issue in Gant was unreasonable

because the search took place after the defendant was arrested for driving with a suspended license,

handcuffed and locked in a patrol car, thus he could not possibly access the vehicle. In addition,

---

[5] In Gant, the Supreme Court noted that its prior decision in New York v. Belton, 453 U.S. 454 (1981), wherein it was held that an officer who lawfully arrests "the occupant of an automobile, . . . may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," id. at 460, had been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there was no possibility he could gain access to the vehicle at the time of the search. See Gant, 127 S.Ct. at 1718. The Gant Court rejected that broad reading of Belton. See id. at 1721.

14

an evidentiary basis for the search was lacking because the defendant was arrested for driving with a suspended license, "an offense for which police could not expect to find evidence in the passenger compartment of Gant's car." Id. at 1719.

Unlike Gant, in this case, there was an evidentiary basis for any vehicle search that occurred. While the defendant in Gant was arrested for driving with a suspended license, an offense for which the police could not expect to find evidence in his vehicle, defendant Jones was arrested for possession of heroin. Thus, the police could have concluded that evidence of drug dealing would be found in her vehicle.

**C.** **Following her arrest on May 27, 2008, defendant voluntarily made statements to the police after having been provided a Miranda warning, thus those statements need not be suppressed**

Defendant argues any statements she made after her roadside arrest on May 27, 2008, must be suppressed because she was in custody at the time and was not provided with a Miranda warning. In the alternative, defendant asserts her statements must be suppressed because they were not voluntary.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that statements obtained during a custodial interrogation where a person was not informed of his right to counsel or his right to remain silent were obtained in violation of the Fifth Amendment and were, therefore, inadmissible. Id. at 477-79. Statements elicited during a custodial interrogation are admissible only if a person voluntarily, knowingly and intelligently waives his rights. Id. at 444, 475. If a person requests counsel at any point during such an interrogation, law enforcement officials must stop the questioning. Id. at 445.

A defendant who has been advised of, but has not yet invoked, his Miranda rights may

15

waive them-- provided he does so knowingly, intelligently and voluntarily, given the totality of the circumstances. See Moran v. Burbine, 475 U.S. 412, 422-23 (1986). Statements not obtained in violation of a person's Miranda rights are nonetheless subject to suppression as violative of due process if the statements are coerced or involuntary. Arizona v. Fulminante, 499 U.S. 279, 288-91 (1991). A statement is coerced or involuntary if the behavior of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." Rogers v. Richmond, 365 U.S. 534, 544 (1961). Factors relevant to determining whether a statement is voluntary include the following: whether the police engaged in coercive activity; the length, location and continuity of the interrogation; the age, education, physical and mental condition of the defendant; and whether the police advised the defendant of his rights to remain silent and have counsel present during an interrogation. See Withrow v. Williams, 507 U.S. 680, 693 (1993). It is the government's burden to show by a preponderance of the evidence that the challenged statements are voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972).

Here, Sergeant Snyder credibly testified that he gave defendant a Miranda warning after she was placed into custody at the scene of her roadside arrest on May 27, 2008. Second Tr. at 62, 137-38. After that, defendant told the police there were more drugs in her house, which she wanted to have removed before her young son arrived home from school. Second Tr. at 138, 157, 164.

Defendant did not invoke her rights under Miranda, but rather made voluntary statements to the police concerning additional drugs that she had stored in her house. The police were not interrogating defendant when she made those statements, and there is no evidence to otherwise suggest that the police engaged in coercive conduct. Although this purportedly was defendant's first arrest, she demonstrated by her testimony at the suppression hearings at least an average level

16

of intelligence such that she was aware of the import of her statements. Further, defendant does not have any physical or mental condition that would undermine the voluntariness of her statements. Accordingly, after having been properly advised of her rights under <u>Miranda</u>, defendant voluntarily made statements to the police on May 27, 2008, concerning additional drugs stored at her house.

### D. Defendant voluntarily consented to a search of her residence

Defendant argues the evidence seized from her home, which includes heroin and $5,759 in currency, must be suppressed because the police did not have probable cause or a warrant to enter her residence, and she did not voluntarily consent to a search of her residence. Rather, defendant alleges she only signed the consent to search form because the police coerced her to do so.

The general rule is that warrantless searches and seizures inside a home are presumptively unreasonable. <u>See</u> <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980). That rule, however, is subject to certain exceptions. "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). To justify a search based on consent, the government "has the burden of proving that the consent was, in fact, freely and voluntarily given." <u>Id</u>. at 222.

According to both Sergeant Snyder and Detective Goob, after defendant was given a <u>Miranda</u> warning at the scene of her roadside arrest and informed of their intent to apply for a search warrant for her residence, she advised them she had additional heroin stored at her residence, which she wanted removed before her young son returned home from school. Defendant

AO 72
(Rev. 8/82)

further indicated she would show the police where the heroin was located. The officers then transported defendant to her residence and used her key to open the front door. The officers realized at that point they did not have a consent to search form with them, so they waited approximately ten minutes for other officers to deliver one. During this time, Detective Goob sat with defendant in the dining area.

After obtaining the consent form, Detective Goob filled it out, read the consent to search section to defendant and asked if she understood it. Defendant responded that she understood the form, read it over herself and then signed it. After defendant gave her consent, Detective Goob remained downstairs with her daughter, while she accompanied the other officers upstairs and showed them where the heroin was located in a dresser drawer in her bedroom.

Defendant's testimony on the issue of consent differs sharply from the officers' account. Defendant disputes that she told the police to take her to her house and remove heroin she had stored there before her son arrived home from school. According to defendant, the police entered her home using keys they seized from her, without her permission, and then escorted her in handcuffs in front of her teenage daughter, who was home at the time, and dressed only in a bathrobe. Defendant further claims the police refused to allow her daughter to dress or leave the premises, and even questioned the girl, who was clearly upset, over defendant's objection.[6]

---

[6] Defendant's daughter, TaTyona Council, testified that she was scared when she saw police arrive at her house with her mother in custody, and Sergeant Snyder candidly admitted that Ms. Council was upset and cried because of the situation. Second Tr. at 146, 160, 191. Ms. Council also testified that the police pressured defendant to sign a paper authorizing the police to search their residence. Second Tr. at 193-96. The court notes Ms. Council's distress was not unusual considering her mother's arrest on drug charges and the fact that the police were at her home to conduct a search. However, the court does not fully credit Ms. Council's testimony that the police pressured defendant to sign a consent to search form. Ms. Council, who was 14-years old when these events occurred, was in an understandably emotional state at the time, thus her recollection may have been tainted by the passage of time and her concern for her mother. The court notes Ms. Council exhibited some hesitancy when she testified at the suppression hearing, which could have been caused by having to testify in open court in her mother's case, but the court nevertheless is obliged to consider Ms. Council's obvious interest in the outcome of her mother's case.

AO 72
(Rev. 8/82)

Defendant alleges the police threatened to tear apart her home and turn her children over to Children and Youth Services if she did not consent to a search. Further, defendant claims the police admonished her daughter to convince her to sign the consent to search form, and defendant finally signed the form only because of the coercive police action.

The court, as finder of fact, is free to accept or reject any part or all of a witness's testimony. United States v. Conley, 859 F.Supp. 830, 840 (W.D.Pa. 1994). Credibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic.

With these concepts in mind, the court credits the testimony of the police officers and finds defendant's testimony on the issue of consent to search, as well as the circumstances surrounding the traffic stop, arrest and search of her purse and vehicle, to be less than credible.

First, defendant's testimony on all of these matters is contradicted by the testimony of Sergeant Snyder and Detectives Molitaris and Goob. The testimony of these officers was consistent concerning the circumstances leading to the traffic stop of defendant's vehicle, Detective Goob's plain view observation of heroin in defendant's purse and her subsequent arrest, her statements to officers at the scene concerning additional heroin she had stored at her house, and the fact that she voluntarily consented to a search of her home, as reflected by the consent to search form that she executed.

Further, defendant's credibility is seriously undermined by her assertion that she was

19

unaware 278 bricks of heroin were located in her bedroom dresser. Defendant admitted that the eight bricks of heroin in her change purse belonged to her, that she put the heroin in her change purse, and that she had obtained the heroin from underneath her kitchen sink. Second Tr. at 238-39. Defendant further admitted that she intended to sell those eight bricks of heroin. Second Tr. at 239. Defendant claimed, inexplicably, that she did not know there were 278 bricks of heroin in her bedroom dresser, because she did not put the heroin there and was not sure who did, despite the fact that the only other occupants of the residence were her two minor children. Second Tr. at 237, 241. Considering defendant and her two children were the only occupants of her residence, it defies logic to suggest she had no idea how 278 bricks of heroin appeared in her bedroom dresser. The court finds that defendant's testimony on this critical matter, coupled with the fact that she has an obvious and substantial stake in the outcome of this case, generally undermines her credibility.

The court finds credible the officers' testimony regarding consent to search defendant's residence. As stated above, each of the officers' testimony on that matter was consistent and corroborated by that of the others. Further, the officers exhibited no hesitancy in their recollection of the circumstances surrounding defendant providing consent to search. Accordingly, the court credits the officers' testimony, and concludes that defendant consented to a search of her residence.

Having determined that defendant gave consent to search, we next must consider whether her consent was voluntary. Consent to a search is valid if it is voluntary, meaning that consent must not be coerced, by explicit or implicit means, or by implied threat or covert force. Schneckloth, 412 U.S. at 228, 248. Whether consent to search was voluntarily given "is a question of fact to be determined from the totality of all the circumstances." Id. at 227. Factors to consider

include the age, education and intelligence of the accused, whether she was advised of her constitutional rights, the length of the encounter, the repetition or duration of the questioning, and the use of physical punishment. Id. at 226; see also United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). In considering the totality of the circumstances, it must be noted that the police are not required to advise the defendant of her right to refuse consent before eliciting her consent. Kim, 27 F.3d at 955 (citing Schneckloth, 412 U.S. at 231-34).

Considering the totality of the circumstances here, the court concludes that defendant's consent to search her home was voluntary. When defendant testified at the suppression hearings, the court observed that she was at least of average intelligence and had no difficulties understanding or responding to the questions posed to her. At the time defendant gave consent, she was an adult in her late twenties who had a high school education. There is nothing in the record indicating that defendant's age, educational background or intelligence in any way limited her ability to voluntarily consent to the search.

Although defendant had been arrested prior to giving consent, she volunteered information to the police concerning additional heroin stored in her house and offered to show them where it was located. In addition, prior to consenting, Detective Goob sat with defendant in the dining area of her house and read her a consent to search form, which fully advised her of her constitutional rights. After reading the form herself, defendant signed it thereby indicating that she understood her rights, and acknowledging she voluntarily consented to the search of her residence "without threats or promises of any kind being made to [her]." Under the totality of the circumstances, the court finds that defendant's consent to search her residence was voluntary.

21

**E.    Defendant's statements to Agents Cicco and Fattori on May 30, 2008, at the ACJ must be suppressed because they were obtained in violation of her Fifth Amendment right to counsel**

Following the search of defendant's residence on May 27, 2008, she was transported to police headquarters for questioning. Defendant was read a pre-interrogation warning and advised of her right to remain silent and her right to consult with a lawyer. Second Tr. at 84, 147. In response to questions on a Pre-Interrogation Warning Form, defendant indicated in writing that she understood her rights, but she was not willing to waive her rights and answer questions without a lawyer present. At that point, the police ceased questioning because defendant had invoked her right to remain silent and right to counsel. Defendant then was incarcerated at the ACJ on the heroin charges and she retained Attorney Wymard to represent her in connection with that matter. Attorney Wymard met with defendant at the ACJ and advised her not to speak with law enforcement without him present. First Tr. at 45.

On May 30, 2008, Agents Cicco and Fattori went to the ACJ to interview defendant concerning the straw purchases of two firearms. First Tr. at 7, 9. The agents were aware defendant had been arrested in connection with a heroin-related incident that occurred a few days prior, but they were unaware of the details of that arrest, and did not know whether she had invoked her Miranda rights at the time of her prior arrest. First Tr. at 7-8, 33-34.

Agent Fattori advised defendant of her Miranda rights, and then told her they were there to interview her about the firearms purchases, but not to discuss her recent drug-related arrest by the Pittsburgh Police. First Tr. at 10, 14, 35-36. After inquiring with defendant, the agents learned that she had retained Attorney Wymard to represent her on the heroin charges. First Tr. at 35, 44-45. Defendant testified she advised the agents that she did not wish to speak with them without

22

her lawyer present, but they proceeded to question her about the firearms purchases. First Tr. at 47-48.

During the interview, defendant made statements concerning the firearms purchases, including the fact that she purchased the guns for her boyfriend, Brian Edwards. First Tr. at 14-16. Eventually, the conversation turned to other topics, including how long defendant and Mr. Edwards had been selling heroin. First Tr. at 16-17.

Defendant argues that statements she made to Agents Cicco and Fattori at the ACJ on May 30, 2008, must be suppressed because the agents did not scrupulously honor her previously invoked right to remain silent and right to counsel in violation of her Fifth and Sixth Amendment rights. Defendant alleges that she invoked her right to remain silent and her right to counsel after her arrest on May 27, 2008, while at police headquarters. Defendant subsequently retained counsel, and did not initiate further questioning with law enforcement. Defendant alleges she told Agents Cicco and Fattori that she was uncomfortable speaking to them without her retained counsel, but the agents pressured her into speaking with them by assuring her that her statements were not being recorded or written down and promising to assist her in being reunited with her children. For reasons explained below, defendant's statements on May 30, 2008, to Agents Cicco and Fattori must be suppressed because they were obtained in violation of her Fifth Amendment right to counsel.

Subsequent to Miranda, which established the right to have counsel present during custodial interrogation, in Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held that an accused who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Id. at 484-85. The Supreme

23

Court emphasized in Edwards "that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." Edwards, 451 U.S. at 485.

Unlike an accused's Sixth Amendment right to counsel, the rule established in Edwards is not offense specific.[7] In Arizona v. Roberson, 486 U.S. 675, 685-87 (1988), the Supreme Court held that a suspect, who invoked his right to have an attorney present during an interrogation concerning a burglary, could not be interrogated three days later concerning a different burglary, and incriminating statements he made during the second interrogation were properly suppressed. Moreover, the fact that the officer who conducted the suspect's second interrogation was unaware he had requested counsel did not justify the failure to honor that request because Edwards focuses on the state of mind of the suspect, not the police. Roberson, 486 U.S. at 687.

"Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel." Roberson, 486 U.S. at 687-88; see also Alston v. Redman, 34 F.3d 1237, 1243 (3d Cir. 1994) ("officers who interrogate a suspect after the suspect has invoked his right to counsel are charged with the knowledge of the prior invocation"). Thus, once a suspect invokes his Miranda right to counsel for questioning regarding one offense, he may not be re-approached regarding *any* offense unless counsel is

---

[7]In McNeil v. Wisconsin, 501 U.S. 171 (1991), the Supreme Court explained when the Sixth Amendment right to counsel arises: "The Sixth Amendment right [to counsel] ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Id. at 175 (citations and internal quotation marks omitted).

24

present. See McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) (citing Roberson, 486 U.S. 675)[8]; see also Alston, 34 F.3d at 1243 ("a suspect who has requested the presence of counsel cannot be questioned concerning *any* crime, not just the one that put him in custody").

For the Fifth Amendment right to apply, the suspect "at a minimum, [must make] some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." McNeil, 501 U.S. at 178 (emphasis in original).

Here, defendant clearly and unequivocally invoked her Fifth Amendment right to counsel while at police headquarters on May 27, 2008, following her heroin-related arrest. Defendant's invocation of her right to counsel is memorialized on the Pre-Interrogation Warning Form that she executed, which indicates she was advised of her right to remain silent and her right to consult with a lawyer, and she understood those rights, but she did not wish to waive those rights and answer questions without the presence of a lawyer.

As established by Edwards and Roberson, because defendant invoked her right to counsel on May 27, 2008, for questioning relative to the heroin charge, law enforcement officers were not permitted to re-approach her regarding any offense unless counsel was present. Thus, Agents Cicco and Fattori were not permitted to question defendant at the ACJ on May 30, 2008, regarding the straw purchase of firearms or any other matters that were discussed, including her drug distribution activities with Brian Edwards, because Attorney Wymard, who was her lawyer at the time, was not

---

[8] In McNeil, the Supreme Court highlighted the difference between the Sixth Amendment right to counsel and the Miranda-Edwards Fifth Amendment right to counsel. The purpose of the Sixth Amendment right is to "protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." McNeil, 501 U.S. at 177-78 (citations and internal quotation marks omitted). The purpose of the Fifth Amendment right to counsel is to protect the suspect's "desire to deal with the police only through counsel." Id. at 178 (citing Edwards, 451 U.S. at 484).

AO 72
(Rev. 8/82)

present when the questioning occurred. It is irrelevant that Agent Cicco testified he was unaware whether defendant had invoked her Miranda rights at the time of her prior arrest on the heroin-related charge because the federal agents are charged with knowledge of the prior invocation.[9]  See Roberson, 486 U.S. at 687-88; Alston, 34 F.3d at 1243.

For these reasons, Agents Cicco's and Fattori's questioning of defendant at the ACJ on May 30, 2008, violated her Miranda-Edwards Fifth Amendment right to counsel, and any statements she made to the agents during that interview must be suppressed.

Having concluded that defendant's statements to the agents on May 30, 2008, were taken in violation of her Fifth Amendment right to counsel, and therefore must be suppressed, the court need not address defendant's additional arguments that those statements were taken in violation of her right to cut off questioning, as well as her Sixth Amendment right to counsel.

### III.    Motion to Produce Evidence Which the Government Intends to Use Under Fed.R.Evid. 404(b) and 609 (Document No. 29)

Defendant seeks an order compelling the government to provide her with a statement of the nature, dates and places of occurrences of any criminal offenses or acts of misconduct other than those set forth in the indictment which the government will attempt to prove at trial pursuant to Fed.R.Evid. 404(b) and/or evidence of any prior convictions pursuant to Rule 609. Defendant also requests a pretrial hearing to determine the admissibility of any evidence the government intends

---

[9]Even though the agents are charged with knowledge of defendant's prior invocation of her Fifth Amendment right to counsel according to the authority of Roberson and Alston, the court notes that Agents Cicco and Fattori discussed with defendant the fact that she had retained Attorney Wymard to represent her on the heroin charges, see First Tr. at 35, 44-45, which in any event should have given them pause to consider whether she previously had invoked her Miranda rights, particularly her right to have counsel present, and thus whether it was proper for them to question her without Attorney Wymard present.

AO 72
(Rev. 8/82)

to offer under Rule 404(b).

Rule 404(b) requires the government to provide reasonable notice prior to trial of its intention to use evidence of other crimes, wrongs or acts for the purposes enumerated in the rule. It provides "that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial." According to the commentary to Rule 404(b), other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes reasonable notice will depend on the circumstances of each case.[10]

In response to defendant's motion, the government indicated that it intends to use defendant's two-page statement to ATF agents on May 30, 2008, concerning her drug trafficking activity. As stated above, defendant's statements to the ATF agents on May 30, 2008, will be suppressed. In any event, the government has complied with Rule 404(b)'s notice requirement. However, to the extent the government decides to introduce any additional Rule 404(b) evidence, the government shall provide defendant with the required notice ten days before trial.

Regarding defendant's request for a pretrial hearing on the admissibility of Rule 404(b) evidence, that request will be denied. It is preferable to resolve Rule 404(b) objections in conjunction with the factual context of the case. See United States v. Giampa, 904 F.Supp. 235, 284 (D.N.J. 1995) ("Generally, objections as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage.").

As for defendant's request under Rule 609, the government indicates if defendant testifies

---

[10]Courts that have considered what constitutes "reasonable notice" have concluded that notice of intent to use Rule 404(b) evidence seven to ten days prior to trial is sufficient. See United States v. Evangelista, 813 F.Supp. 294, 302 (D.N.J. 1993) (ten days); United States v. Alex, 791 F.Supp. 723, 728-29 (N.D.Ill. 1992) (seven days).

AO 72
(Rev. 8/82)

at trial, it will seek to impeach her testimony with any and all prior qualifying felony convictions.[11]

## IV. **Conclusion**

For the foregoing reasons, defendant's pretrial motions will be granted in part and denied in part. Most significantly, defendant's motion to suppress the physical evidence in this case will be denied, and her motion to suppress statements will be granted in part and denied in part as set forth herein. An appropriate order will follow.

<br>

*Gustave Diamond*
Gustave Diamond
United States District Judge

Date: *May 25, 2011*

cc:    Margaret E. Picking
       Assistant U.S. Attorney

       Marketa Sims
       Assistant Federal Public Defender

---

[11] Rule 609(a)(1) allows, for the purpose of attacking the credibility of an accused, the admission of evidence that the accused has been convicted of any crime punishable by death or imprisonment in excess of one year if the court determines that the probative value of admitting that evidence outweighs the prejudicial effect to the accused. Rule 609(a)(2) further provides that evidence that any witness has been convicted of a crime involving dishonesty or false statement shall be admitted regardless of punishment. The only notice requirement in Rule 609 is that the government is required to provide "sufficient advance written notice" of its intent to use evidence of a conviction more than ten years old. Fed.R.Evid. 609(b).

AO 72
(Rev. 8/82)